[No. C067436. Third Dist. Jan. 20, 2017.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR TYRONE GARRETT, Defendant and Appellant.

[No. C069886. Third Dist. Jan. 20, 2017.]

THE PEOPLE, Plaintiff and Respondent, v.
ERION DEMONTA VARNADO, Defendant and Appellant.

C<small>OUNSEL</small>

Barbara Michel, under appointment by the Court of Appeal, for Defendant and Appellant Victor Tyrone Garrett.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Erion Demonta Varnado.

Kamala D. Harris, Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Charles A. French, Craig S. Meyers and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

O<small>PINION</small>

**HOCH, J.**—This appeal arises out of Victor Tyrone Garrett and Erion Demonta Varnado's participation in armed robberies and an attempted armed robbery in November 2008.[1] Both Garrett and Varnado were 17 years old when the offenses were committed, but were tried as adults. (Welf. & Inst. Code, § 707, subd. (b)(3); *id.*, former subd. (c).) A jury convicted Garrett of six counts of second degree robbery (Pen. Code, § 211),[2] two counts of kidnapping for robbery (§ 209, subd. (b)(1)), one count of attempted robbery (§§ 211, 664), and one count of assault with a firearm (§ 245, subd. (a)(2)). For each of the offenses, the jury found true the allegation Garrett personally used a firearm (§ 12022.53, subd. (b)), and as to the assault with a firearm, that Garrett personally discharged a firearm (§ 12022.53, subd. (c)). Garrett was sentenced to serve a total of 74 years four months to life in prison.

Varnado was also convicted by a jury of two counts of second degree robbery, one count of attempted robbery, and one count of assault with a firearm. The jury also found true the allegation Varnado personally used a firearm during the assault and attempted robbery. However, the jury found Varnado not guilty of four counts of robbery. The jury was unable to reach a verdict as to the two counts of kidnapping to commit robbery, the allegation Varnado personally used a firearm during the second degree robberies, or he discharged a firearm during the attempted robbery. The trial court declared a mistrial as to the counts and enhancements for which the jury could not reach a verdict.

On retrial, Varnado was convicted of the remaining two counts of second degree robbery, and the jury found true the allegation he used a firearm

---

[1] Garrett and Varnado were charged along with Antwaan Edwardo Anderson and Vance Hicks. Anderson pleaded guilty before trial, and Hicks admitted his guilt after trial commenced. Neither Anderson nor Hicks is a party in this appeal.

[2] Undesignated statutory references are to the Penal Code.

during these robberies. The second jury was not asked to decide whether Varnado discharged a firearm during the attempted robbery. Varnado was sentenced to serve a total of 31 years to life in prison.

On appeal, both defendants contend (1) the evidence of asportation was insufficient to support their convictions of kidnapping for robbery. In a related argument, Varnado contends (2) the trial court erred in refusing defense counsel's proposed instruction informing the jury that "incidental" movement does not amount to kidnapping for robbery.

Varnado further argues (3) evidence regarding the firing of a gun during the attempted robbery was improperly admitted during his retrial to prove he used a gun on a separate occasion, (4) insufficient evidence of intent to commit theft requires reversal of his attempted robbery conviction, and (5) an unduly suggestive identification procedure was used to identify him two days after the robbery.

Garrett separately argues (6) an in-field showup employed by the police shortly after his arrest was an unduly suggestive identification procedure, (7) his *Miranda* rights were violated during his interrogation by the police,[3] and (8) his prison sentence of 74 years four months to life constitutes cruel and unusual punishment because he was a minor at the time of the offenses.

We conclude defendants' act of moving the victims of kidnapping for robbery from where they were standing into the locked trunk of a car sufficed for the asportation requirement of the offense. Contrary to Varnado's contention, the trial court was not required to give defense counsel's proposed pinpoint instruction. We also find no error in the admission of testimony regarding the discharge of a firearm during the attempted robbery. The evidence was sufficient to establish intent to commit robbery during the attempted robbery. And the police did not use an unduly suggestive identification procedure two days after Varnado's arrest.

As to Garrett's separate claims, the in-field showup did not constitute an unduly suggestive identification procedure. And the police did not violate his Fifth Amendment rights because Garrett knowingly and voluntarily waived his rights after being given a *Miranda* advisement.

Consistent with our original opinion, we affirm Garrett and Varnado's convictions.

As to the sentencing, we now benefit from the California Supreme Court's recent guidance in *People v. Franklin* (2016) 63 Cal.4th 261 [202 Cal.Rptr.3d

---

[3] See *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

496, 370 P.3d 1053] (*Franklin*). After this court filed its original opinion, the California Supreme Court granted review and transferred the cause back to us for reconsideration in light of *Franklin, supra*, 63 Cal.4th 261. In *Franklin*, the Supreme Court held the Legislature's passage of Senate Bill No. 260 (2013–2014 Reg. Sess.) (Senate Bill No. 260) effectively guarantees a youth offender a parole hearing before the Board of Parole Hearings during a juvenile offender's 25th year of incarceration. (*Franklin, supra*, at pp. 276–277.) The *Franklin* court declared the new statutory remedy provides a meaningful opportunity for release and renders moot claims that effective life without parole (LWOP) sentences for crimes committed as a juvenile violate constitutional prohibitions against cruel and unusual punishment. (*Ibid.*) After the cause was transferred back to us, we invited the Attorney General and counsel for defendants to file supplemental briefing as to whether *Franklin* requires a limited remand in this case. We have received and considered supplemental briefing from all parties on this issue. We remand the matter to the trial court for the limited purpose of determining whether defendants have had an adequate opportunity to make a record of mitigating evidence that will be relevant at a future youth offender parole hearing.

## BACKGROUND

### *Robberies of Kilgore, Cheatham, Douglas, and Cordero*
### *(Counts 1–4)*

At approximately 9:00 p.m. on November 15, 2008, Jaquan Cheatham and Lonnie Kilgore were walking to a 7-Eleven store. Two males with guns approached Cheatham and instructed him to empty his pockets. Cheatham heard the cocking of a gun and turned over his school identification and telephone. Cheatham gave the robbers his pants so they would know he had turned over everything. Kilgore also took off clothing and handed it to the robbers.

Thomas Douglas and Alexis Cordero were nearby and watched Cheatham and Kilgore get robbed. Cordero explained she initially saw a black car with three male occupants. Cordero then "had a bad feeling" and turned around to see two of the males "attack" a boy behind her. The robbers brandished guns and took everything from the boy—even his clothes.

Fearing the robbers would attack her group too, Cordero told her friends to run away. Cordero and Douglas hid behind a nearby van. When the same black car drove by, Cordero heard someone from the car tell them to come out from behind the van. Cordero and Douglas did so with their hands up. One of the robbers instructed, "Lean up against the garage and give us

everything that you have." The same two robbers that had attacked the boy appeared with guns drawn and took Cordero's shoes, jacket, money, cell phone, and chain. Douglas gave the robbers his necklace and wallet.

At approximately 3:00 a.m. on November 28, 2008, Sacramento County Sheriff's Deputy Michael Putnam drove Cheatham, Kilgore, Areél Robinson, and Markeisha DeMyers to view suspects who had been arrested in Elk Grove. Although Detective Mark Bearor at the Elk Grove Police Department planned to line the witnesses up in a hallway face-to-face with the suspects, the witnesses refused the proposed procedure. Instead, the four witnesses observed the suspects from a patio area through a plate glass window at a distance of 15 to 25 feet. Deputy Putnam led the witnesses, one at a time, to the patio area where they viewed the suspects.

As to defendants in this appeal, Cheatham stated with certainty Varnado was one of the males who robbed him. However, Cheatham was not able to identify Garrett. DeMyers identified Varnado but not Garrett. The record does not indicate what identifications, if any, were made by Kilgore or Robinson.

### Kidnapping for Robbery of Gutierrez and Gribben (Counts 5–8)

Abel Gutierrez and Sheila Gribben went on their first date together on November 18, 2008. Shortly after midnight on November 19, 2008, they returned from the movies to Gribben's apartment complex in Sacramento. They talked next to Gutierrez's car for approximately 30 minutes when he noticed a champagne-colored car with four males wearing black sweaters. Gutierrez mentioned to Gribben that "something wasn't right." Gutierrez lost sight of the car behind a hill, but soon saw the four occupants walking by him and Gribben. One of the males pointed a long, silver revolver at Gutierrez's head and instructed him to take off his clothes. Gutierrez refused and was then told to empty his pockets. Eventually, Gutierrez took out his cell phone, wallet, and keys, and handed them over. The male with the gun then patted Gutierrez down to see if he had turned over everything. Gutierrez was then told to hand over the peacoat he was wearing.

The robbers then told Gutierrez to sit down on a curb. While Gutierrez watched, the males took some earrings and keys from Gribben. Gutierrez told them to let Gribben go. The male with braids in his hair responded, "She's not going anywhere." Gribben complied with an instruction to sit next to Gutierrez on the curb.

The robbers took Gutierrez's keys and attempted to open the trunk of his car. Unable to do so, they told Gutierrez to unlock his trunk. Gutierrez

unlocked the trunk by pushing a button inside the passenger compartment. The robbers told Gutierrez to give them the subwoofer speakers he had in the trunk. But Gutierrez explained they could not easily be removed because they were wired to the car. The male with braids responded, "We'll just take the whole damn car." He then told Gutierrez to get into the trunk.

Gutierrez feared the males would end up killing them if he and Gribben got into the trunk. Hoping to avoid getting into the trunk, Gutierrez told them "just to take off and leave, that they had taken everything we had and weren't going to do anything; that if we were going to try anything we would have done that before any of that had happened." The male with braids responded, "Are you trying to die tonight?" The males called Gribben over and put her into the trunk with Gutierrez. They slammed the trunk twice on Gutierrez's head when trying to close it and succeeded in closing it on the third try. Gutierrez worried they would not be able to get out.

Gutierrez and Gribben heard the robbers rummaging through the car for a few minutes before they left. Gribben began to panic and Gutierrez tried to calm her down. After hearing the robbers run away, Gutierrez and Gribben waited for a few minutes before Gutierrez began to tear away the lining of the trunk. Gutierrez and Gribben shouted for help. Approximately five to 10 minutes later, Gribben's housemate let them out and called the police. Gutierrez discovered an iPod and headphones had been taken from the interior of the car. Gribben's watch and camera also had been taken.

Several hours later, Sacramento Police Officer Wesley Nezik received word a vehicle matching the descriptions given by Gutierrez and Gribben had been located. Officer Nezik contacted Gutierrez and Gribben and transported them to the Elk Grove area where the vehicle had been found. Gutierrez immediately recognized the car as the one in which he had seen the robbers. Gutierrez and Gribben also recognized items stolen from them.

Officer Nezik then drove Gutierrez and Gribben to an in-field showup at the Elk Grove Police Department. Officer Nezik testified: "[O]n the way to the police department, I explained to them that there were people who were being detained. They may or may not be related to their situation from the previous robbery that happened there. They may or may not be in handcuffs. If they are, it's for our safety and for theirs." At the police station, Gutierrez and Gribben were escorted inside but indicated they were scared about the prospect of meeting the robbers face-to-face. Officer Nezik led them outside and allowed them to sit in the backseat of the patrol vehicle. The officer testified it was not "an ideal way to do it" but he was the only police officer available to do a field showup. The patrol car lights were turned on and the suspects were brought into the light one at a time. Given the unusual nature

of the field showup, Officer Nezik instructed Gutierrez and Gribben not to discuss the suspects between themselves. The victims agreed.

As to defendants in this appeal, Gribben stated about Varnado that he had "a similar haircut" to one of the robbers. By contrast, Gutierrez "stated that he did recognize the hair [on Varnado] because it was very distinct because the braids were sticking up in the air." Neither Gutierrez nor Gribben recognized the second suspect, Vance Hicks. When Anderson was brought out, Gribben stated: "That's him. He was the one pointing the gun at me demanding my stuff" and one of the males who told them to get into the trunk. Gutierrez also "seemed very confident" in identifying Anderson. When Garrett was brought out, Gribben was "not sure about him." Gutierrez said Garrett "looked familiar and that someone there on scene was wearing . . . similar clothing."

### Assault and Attempted Robbery of Mangano (Counts 9–10)

Early in the morning on November 19, 2008, John Mangano delivered newspapers by car in Elk Grove. Mangano had just gotten back into his vehicle when a "silverfish color" car pulled diagonally in front of his car "and blocked [him] off." Mangano noticed three doors opened and three males got out of the car. Mangano asked, "Well, what's going on?" He then observed the male behind the driver holding a black revolver at waist level. Mangano threw his car into reverse, ducked down, and began to drive away. Before he ducked, Mangano caught a glimpse of four males from the car.

Mangano had driven approximately 20 to 25 feet when he heard a gunshot. When Mangano next looked up, he saw two of the males were holding guns "like in the gangster movies" and heard additional shots ring out. Once Mangano had gotten 40 yards away, he looked up again and saw the males get back into their car. As the car drove away on Elk Grove Boulevard, Mangano decided to follow it. While following the car, Mangano called the police with his cell phone. Elk Grove Police Officers Shane Glaser and Robert Barnes responded to the call in their patrol cars. Matching the description of the suspect vehicle and location was a gray, four-door Pontiac Grand Am. The officers pulled the car over and arrested the four occupants: Varnado, Garrett, Hicks, and Anderson.

A search of the suspect vehicle turned up two handguns, four spent casings, an iPod, headphones, four cell phones, keys, and a purple digital camera, several purses, and a black jacket.

After his arrest, Garrett was interviewed by the police. Garrett admitted he was riding with Varnado, Hicks, and Anderson. Along with him, Garrett had a

gun he had stolen from his grandfather a few weeks earlier. Garrett's hands were tested for gunshot residue. The test indicated Garrett had recently "fired a weapon, was near a weapon when it was fired, or handled a fired weapon or fired ammunition."

## Defense Evidence

Garrett introduced evidence he was at his house on the evening of November 15, 2008, when Kilgore, Cheatham, Douglas, and Cordero were robbed. Garrett's sister, Victoria Garrett, testified he had been present the entire time at a family barbecue that lasted until 1:00 or 2:00 in the morning. This testimony was corroborated by a friend of Garrett's and by a neighbor who testified Garrett had been present at the barbecue.

Varnado introduced the testimony of Dr. William Shomer, an expert on witness identification, perception, and memory. Dr. Shomer testified that (1) "people are highly unreliable with respect to cognition of strangers," (2) people overestimate their certainty of identification when suspects have similar appearances, (3) cross-racial identifications tend to be "far less accurate," (4) the stress of being assaulted by a weapon has an adverse effect on the ability to remember accurately, and (5) the identification procedure employed can make a significant difference in outcomes.

## Varnado's Retrial

Varnado was retried after the first jury was unable to reach a verdict on the counts of kidnapping for robbery against Gutierrez and Gribben or on the allegations of personal firearm use against Gutierrez and Gribben. As pertinent to the issues raised on appeal by Varnado, the evidence at the second trial showed the robbers made Gribben sit on the curb about 10 feet from Gutierrez's car during the robbery. Gutierrez did not sit, but stood next to Gribben. According to Gribben, the robbers did not move them to the curb. Instead, Gribben and Gutierrez were already standing there when the robbery started.

The robbers told Gutierrez to open his car trunk. When the robbers saw the subwoofer speakers inside they tried to remove them, but were unsuccessful. They debated stealing the car. The robbers then told Gutierrez to get into the trunk. The robbers then instructed Gribben to get up from the curb and climb into the trunk with Gutierrez. The robbers twice slammed the trunk onto Gutierrez's head before they were able to close the trunk.

DISCUSSION

I–VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VIII

### *Sentencing*

In the original briefing, Garrett contended his sentence of 74 years four months to life in prison for nonhomicide crimes committed as a minor constitutes cruel and unusual punishment under the Eighth Amendment. Based on the California Supreme Court's recent decision in *Franklin, supra*, 63 Cal.4th 261, we conclude Garrett's original argument is moot. However, all parties in their posttransfer supplemental briefing argue *Franklin* requires a remand to the trial court for the limited purpose of determining whether defendants have had an adequate opportunity to make a record of mitigating evidence that will be relevant at a future youth offender parole hearing. We agree.

### A.

### *Additional Background*

Both Garrett and Varnado were 17 years old when they committed the offenses for which they were convicted. In January 2011, the trial court sentenced Garrett to serve a term of 74 years four months to life in prison. In December 2011, the trial court sentenced Varnado to serve a total of 31 years to life in prison.

### B.

### *Analysis*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments" and "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 123 S.Ct. 1179], quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996–997 [115 L.Ed.2d 836, 111 S.Ct. 2680] (conc. opn. of Kennedy, J.).) This constitutional right " 'flows from the basic "precept of

---

*See footnote, *ante*, page 871.

justice that punishment for crime should be graduated and proportioned" ' to both the offender and the offense." (*Miller v. Alabama* (2012) 567 U.S. 460, 461 [183 L.E.2d 407, 132 S.Ct. 2455, 2458] (*Miller*), quoting *Roper v. Simmons* (2005) 543 U.S. 551, 560 [161 L.Ed.2d 1, 125 S.Ct. 1183].)

In *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825, 130 S.Ct. 2011] (*Graham*), the United States Supreme Court held the Eighth Amendment "prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender." (*Graham, supra*, at p. 75.) The court explained: "As compared to adults, juveniles have a ' "lack of maturity and an underdeveloped sense of responsibility" '; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.] A juvenile is not absolved of responsibility for his [or her] actions, but his [or her] transgression 'is not as morally reprehensible as that of an adult.' [Citation.]" (*Id.* at p. 68.) The court also explained that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and therefore, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." (*Id.* at p. 69.)

Turning to the severity of an LWOP sentence, the *Graham* court explained such a sentence "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence," and noted this is "an especially harsh punishment for a juvenile," who "will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender." (*Graham, supra*, 560 U.S. at pp. 69–70.) Finally, the court explored the penological justifications for such a sentence and concluded them to be "not adequate to justify life without parole for juvenile nonhomicide offenders." (*Id.* at p. 74.) However, the court was also careful to point out the Eighth Amendment "does not require the State to release that offender during his [or her] natural life," explaining: "Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Graham, supra*, at p. 75.)

In *Miller, supra*, 567 U.S. 460 [132 S.Ct. 2455], the United States Supreme Court held the Eighth Amendment forbids a state from *mandating* the imposition of an LWOP sentence on a juvenile homicide offender. (*Miller, supra*, at pp. 478–480 [132 S.Ct. at p. 2469].) The court explained: "Mandatory life without parole for a juvenile precludes consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at pp. 477–478 [132 S.Ct. at p. 2468].) The court concluded: "Although we do not foreclose a sentencer's ability to [impose an LWOP sentence on a juvenile] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 480 [132 S.Ct. at p. 2469].)

In *People v. Caballero* (2012) 55 Cal.4th 262 [145 Cal.Rptr.3d 286, 282 P.3d 291] (*Caballero*), our Supreme Court held, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy," i.e., the "functional equivalent" of an LWOP sentence, "constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. . . . [T]he sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' " (*Id.* at pp. 268–269, quoting *Graham, supra*, 560 U.S. at p. 75.)

■ In *Franklin, supra*, 63 Cal.4th 261, our Supreme Court held, "just as *Graham* applies to sentences that are the 'functional equivalent of a life without parole sentence' [citation], so too does *Miller*[, *supra*, 567 U.S. 460 [132 S.Ct. 2455] apply to such functionally equivalent sentences," such that "a juvenile may not be sentenced to the functional equivalent of LWOP for a homicide offense without the protections outlined in *Miller*." (*Franklin, supra*, at p. 276.) However, the court also held the Legislature's passage of Senate Bill No. 260 that became effective January 1, 2014, and provides juvenile offenders with an opportunity for parole at least by their 25th year of incarceration, renders moot an assertion that "an otherwise lengthy mandatory sentence" was imposed in violation of *Miller*, at least where the defendant is not excluded from eligibility for such a parole hearing. (*Franklin, supra*, at p. 280.)

In so holding, the court explained, "the Legislature passed Senate Bill No. 260 explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*." (*Franklin, supra*, 63 Cal.4th at p. 277.) It did so by adding section 3051 to the Penal Code, "which requires the Board [of Parole Hearings] to conduct a 'youth offender parole hearing' during the 15th, 20th, or 25th year of a juvenile offender's incarceration," depending on the length of the offender's " 'controlling offense.' " (*Franklin, supra*, at p. 277, quoting § 3051, subds. (a)(2)(B), (b).) Thus, section 3051 "provides all juvenile offenders with a parole hearing during or before their 25th year of incarceration," unless they come within one of the statute's exclusions, set forth in subdivision (h). (*Franklin, supra*, at p. 277.) While a juvenile offender's original sentence remains operative, "section 3051 has changed the manner in which [that] sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole," thereby "supersed[ing] the statutorily mandated sentences" of non-excluded juvenile offenders. (*Id.* at p. 278.) "The Legislature has effected this change by operation of law, with no additional resentencing procedure required." (*Id.* at pp. 278–279.) Because the parole eligibility cap of section 3051 supersedes the mandatory sentence imposed by the trial court, "[s]uch a sentence is neither LWOP nor its functional equivalent," and therefore, "no *Miller* claim arises." (*Franklin, supra*, at p. 280.)

Here, as in *Franklin, supra*, 63 Cal.4th 261, neither Garrett nor Varnado comes within any of section 3051's exclusions. Thus, Garrett and Varnado are both beneficiaries of the newly enacted provision in section 3051 that "effectively reforms the parole eligibility date of a juvenile offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years." (*Franklin, supra*, 63 Cal.4th at p. 281.) In short, Senate Bill No. 260 has rendered moot the *Miller* claim (*Miller, supra*, 567 U.S. 460 [132 S.Ct. 2455]) originally brought by Garrett by superseding his trial court imposed sentence, effectively reforming the parole eligibility

date consistent with the Eighth Amendment. Even though Varnado originally did not make a *Miller* claim based on his trial-court-imposed sentence, the remedy in section 3051 also applies to him.[7]

■ Ordinarily, the conclusion a claim is moot ends our inquiry. However, in *Franklin*, the court remanded the matter to the trial court for the limited purpose of determining whether or not the juvenile offender in that case "was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin, supra*, 63 Cal.4th at p. 284.) This was done because the youth offender parole hearing established by Senate Bill No. 260 "shall provide for a meaningful opportunity to obtain release" (§ 3051, subd. (e)), which requires the Board of Parole Hearings to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity" (§ 4801, subd. (c)), the statutory scheme also "contemplate[s] that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration" (*Franklin*, at p. 283, citing § 3051, subd. (f)), and it was "not clear" whether the juvenile offender in *Franklin* "had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing" (*Franklin*, at p. 284). Indeed, because the juvenile offender in *Franklin* was sentenced before *Miller* was decided, and because the term imposed was a mandatory sentence, the trial court understandably deemed such mitigating evidence irrelevant. (*Franklin*, at p. 282.)

Here, the record shows Garrett and Varnado were sentenced in 2011 before *Miller, supra*, 567 U.S. 460 [132 S.Ct. 2455], before *Caballero, supra*, 55 Cal.4th 262, and before the Legislature enacted sections 3051 and 4801. Thus, the trial court did not have the benefit of the Legislature's later-enacted legislation to ensure the youth-related factors identified in *Miller* would be taken into account at youth parole hearings mandated for the 15th, 20th, or 25th year after sentencing. While some evidence of age and immaturity was presented at sentencing, neither the parties nor the trial court could have foreseen the substantial changes in the law involving sentencing of juvenile offenders. Accordingly, we cannot determine whether defendants had sufficient opportunity to include on the record the sort of information that will be relevant at a youth offender parole hearing under sections 3051 and 4801. (*Franklin, supra*, 63 Cal.4th at p. 284.)

---

[7] Section 3051 sets the time for a youth offender parole hearing at 15, 20, or 25 years based on the longest term of imprisonment for an "offense or enhancement." (§ 3051, subd. (a)(2)(B).) We do not reach the issue of the minimum time of incarceration that must elapse before a youth offender parole hearing be conducted for each defendant.

## DISPOSITION

Our June 30, 2014 decision is vacated. The convictions and sentences of Victor Tyrone Garrett and Erion Demonta Varnado are affirmed. The matter is remanded to the trial court for the limited purpose of determining whether Victor Tyrone Garrett and Erion Demonta Varnado were afforded adequate opportunities to make a record of information that will be relevant to the Board of Parole Hearings to fulfill its statutory obligations under Penal Code sections 3051 and 4801, and, if not, to allow Victor Tyrone Garrett, Erion Demonta Varnado, and the People an adequate opportunity to make such a record.

Hull, Acting P. J., and Robie, J., concurred.

A petition for a rehearing was denied January 27, 2017, and the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied April 12, 2017, S240189.